

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-17-1995

# W B v Matula

Precedential or Non-Precedential:

Docket 95-5033

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"W B v Matula" (1995). *1995 Decisions*. Paper 271.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/271

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-5033


W.B., Parent of the Minor, E.J., on her
own behalf and on behalf of her son, E.J.,
<u>Appellants</u>

v.

JOAN MATULA; MARY ANGELA ENGELHARDT; JUDY BEACH;
CATHERINE BRENNAN; PATRICIA CERICOLA; DR. GARY DANIELSON;
ANN PEARCE; KATHLEEN MAHONY; CAROL BURNS;
FLORENCE NOCTOR; DR. JEFFREY OSOWSKI; NEW JERSEY STATE
BOARD OF EDUCATION; WARREN COUNTY DEPARTMENT
OF EDUCATION; MARY LOU VARLEY; MANSFIELD BOARD OF EDUCATION;
STATE OF NEW JERSEY; DEPARTMENT OF EDUCATION DIVISION OF
SPECIAL EDUCATION; EMPLOYEES OF THE MANSFIELD TOWNSHIP
BOARD OF EDUCATION


Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 93-3124)


Argued August 22, 1995

BEFORE:  GREENBERG, COWEN, and SAROKIN, <u>Circuit Judges</u>

(Filed October 17, l995)


Rebecca K. Spar (argued)
Cole, Schotz, Meisel, Forman
    & Leonard, P.A.
25 Main Street, 4th Floor
Hackensack, NJ  07601

<u>Attorney for Appellant</u>


David A. Wallace (argued)

942 Route 517
P.O. Box 741
Hackettstown, NJ 07840

Attorney for Appellees

OPINION OF THE COURT

SAROKIN, Circuit Judge:

Plaintiff, on behalf of her disabled child, seeks damages for the persistent refusal of certain school officials to evaluate, classify and provide necessary educational services. The matter was dismissed by the district court on the grounds that a settlement of the administrative proceeding barred pursuit of the claims for damages. We conclude that the settlement agreement was not susceptible to summary disposition. Indeed, we question the propriety of demanding and receiving a release of such claims in exchange for providing services to which a disabled child is otherwise entitled. However, since the settlement agreement did not clearly waive such claims, we do not determine whether such a waiver would be against public policy. We do conclude that the agreement does not bar such claims as a matter of law, and therefore reverse and remand the matter for trial.

Plaintiff brought suit pursuant to 42 U.S.C. § 1983, § 504 of the Rehabilitation Act of 1973, and the Individuals with Disabilities Education Act against school officials, alleging that the child was deprived of his right to a free, appropriate

2

public education, in violation of the U.S. and New Jersey Constitutions and federal and state statutes and regulations. Despite resistance by school officials and following extensive administrative proceedings, the mother ultimately succeeded in having her child evaluated, classified as neurologically impaired and provided with special education services. Plaintiffs then sued for compensatory and punitive damages incurred in the period before the school agreed to provide these services. The district court granted summary judgment in favor of all defendants on all claims predicated upon a settlement of the administrative proceeding. We will affirm in part, reverse in part, and vacate in part.

I.

Plaintiff W.B. and her minor child, plaintiff E.J., moved to Hackettstown, New Jersey during the summer of 1991. W.B.'s requests for special educational services for E.J., defendants' alleged resistance to these requests, and the damages arising from this alleged resistance, occurred while E.J. was in the first and second grades. We will recount these events in some detail. While some of the facts may be in dispute, most are not, and in any event, in view of the procedural posture of the case, we recite the facts from the viewpoint of the plaintiffs.

Before the start of school in the fall of 1991, W.B. met with defendant Joan Matula, principal of the Mansfield Township Elementary School ("the school"), to discuss her concerns about E.J.'s behavioral problems, including touching and hitting other

3

children. W.B. also completed forms at the school in which she stated that E.J. had received speech therapy.

E.J. entered the first grade in September 1991 and was placed in a class taught by defendant Mary Angela Engelhardt. Engelhardt soon reported that E.J. exhibited a variety of disruptive behaviors, including not paying attention in class, fighting with other students, failing to remain seated, making continuous noises and repeatedly touching other children. The teacher also observed that E.J. had difficulty beginning tasks, finishing those he did start and coloring within the lines. In addition, throughout the school year E.J. urinated and defecated in his pants. In October the school nurse, defendant Florence Noctor, told W.B. that other children were teasing E.J. because of his "bathrooming problem." Moreover, within the first few weeks of school, Engelhardt informed W.B. that E.J. might have Attention Deficit Disorder/Attention Deficit Hyperactivity Disorder ("ADHD"), a condition with which W.B. was unfamiliar.

In October, W.B. met with Engelhardt and defendant Carol Burns, Chief School Administrator and the person responsible for compliance with the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. and § 504 of the Rehabilitation Act ("§ 504"), 29 U.S.C. § 794. The group discussed E.J.'s behavioral and academic problems, but no defendant referred E.J. for an evaluation or special education services, nor did anyone inform W.B. of E.J.'s possible entitlement to such services. The same month E.J. began to see Dr. Lee Monday, a private therapist.

4

After reading about ADHD later in the fall, W.B. raised it to Dr. Monday, who then diagnosed E.J. as having ADHD. W.B. also spoke with Matula and Engelhardt and sent them literature about the disorder. In December W.B. wrote them explaining that she believed E.J.'s behavioral and academic problems were attributable to ADHD and specifically requested that E.J. be permitted to spend additional time with the school's Resource Team.

The first actual dispute between the parties concerned evaluation. W.B. asked the school to refer E.J. to the Mansfield Child Study Team ("CST") for evaluation;[1] the school refused, but finally agreed after W.B. persuaded Matula, Engelhardt, Burns, and Catherine Brennan, director of the CST,[2] to meet in February 1992 with her, Dr. Monday, and a social worker whom Brennan had agreed to let observe E.J. in the classroom. Brennan had believed that ADHD did not qualify a child for special services under IDEA or §504, but when W.B. showed her a memorandum from the Assistant Secretary of the U.S. Department of Health and Human Services to the contrary, Brennan relented and approved the CST evaluation.

---

[1] Among other duties, each CST in New Jersey is charged with the responsibility of identifying and diagnosing children needing special education services, developing public school programs for disabled children, and referring disabled children for residential, medical, or psychological treatment. N.J.S.A § 18A:46-5.

[2] The duties of a CST supervisor "shall include the coordination of the special education services in the county." N.J.S.A. §18A:46-3.

In April 1992, the CST determined that E.J. had ADHD and was eligible for § 504 services. However, because E.J.'s academic performance was at or above grade level, the CST concluded he was not classifiable under IDEA and therefore not eligible for those services offered under IDEA but not the Rehabilitation Act. The CST concluded:

> [E.J.] has developed academic skills in the areas of reading, mathematics and written language that are at or above his current grade placement. He is, therefore, not eligible for special education services . . . . However, the comprehensive Child Study Team evaluation does identify the presence of [ADHD] . . . . For this reason, [E.J.] is considered to be a handicapped person under Section 504 of the Rehabilitation Act of 1973.

Appendix ("App.") at 98. Though one examining physician on the CST recommended a speech evaluation, audiometry, and tympanometry, these suggestions were not included in the CST report.

Despite the CST finding that E.J. suffered from ADHD and was thus entitled to § 504 services, defendants did not begin providing them. Concerned that the CST evaluation had not fully assessed E.J., W.B. asked defendants to fund an independent evaluation. Defendants refused.

In June 1992, W.B. initiated her first IDEA administrative proceeding before the New Jersey Office of Administrative Law ("OAL"), seeking an independent evaluation of E.J., his classification as neurologically impaired (a status which would render him eligible for IDEA services), development of an Individual Education Plan ("IEP"), and costs and fees. We will refer to this proceeding as "E.J. I." In July 1992, on the date

6

of the E.J. I hearing, respondent Mansfield Board of Education ("the Board" or "Mansfield") signed a consent order agreeing to an independent evaluation and adjourning the hearing on the balance of W.B.'s petition.

The independent evaluation took place soon thereafter. According to ALJ McGill, who heard the first and all subsequent petitions between W.B. and the Board, the evaluation

> was very significant because the determination was made for the first time that E.J. had Tourette's syndrome and a severe form of obsessive-compulsive disorder in addition to ADHD.  Thus, W.B. was substantially correct in her belief that the evaluation by the Mansfield CST did not properly identify E.J.'s problems.

E.J. v. Mansfield, OAL Dkt Nos. EDS 11659-93/11798-93, Sept. 1, 1994 ("E.J. IV"), at 49.

In September 1992 E.J. entered the second grade, joining a class taught by defendant Judy Beach, but his problems continued. Defendants were still not providing § 504 services.

As to classification, despite the findings of the independent evaluation, in November the CST concluded that E.J. was perceptually impaired but not neurologically impaired.  The distinction is important, because the former classification would result in a lower level of IDEA services for E.J. than the latter. W.B. attempted to persuade the school to reclassify her son as neurologically impaired, and in December 1992, Mansfield cross-petitioned to have E.J. classified as perceptually impaired.[3]

---

[3] W.B. filed three other petitions in January and February 1993, seeking to have Mansfield provide her with (1) a written daily log of E.J.'s behavior problems, (2) independent speech, occupational therapy, and educational evaluations, and (3)

7

In April 1993, after nearly ten days of hearings, W.B. and the Board entered into a settlement stipulating that, as W.B. had sought, E.J. would be classified as neurologically impaired. The stipulation also incorporated a thirty-page IEP that extended through the 1993-94 school year and provided for $14,000 for W.B. for attorneys fees and costs. ALJ McGill approved the settlement, E.J. v. Mansfield Board of Education, OAL Dkt. Nos. 5192-92/10038-92, April 12, 1993 ("E.J. I"), and later observed that "the settlement was consistent with the overwhelming weight of the evidence . . . . [I]t would appear that W.B. was substantially correct on the question of classification." E.J. IV at 49-50. E.J. had nearly completed second grade.

---

mediation to resolve her request that the Board fund E.J.'s private psychotherapy. Eventually W.B. prevailed in these requests too. See discussion of E.J. IV, infra.

More administrative proceedings followed,[4] culminating in a final round of petitions filed in November and December 1993. These too were consolidated and referred to ALJ McGill, who held hearings for twenty-seven days, and on September 1, 1994 issued a fifty-four page opinion ordering the Board to (1) place E.J. in a private school at the Board's expense; (2) pay prospectively for E.J.'s sessions with the private therapist, Dr. Monday; (3) reimburse W.B. for the cost of an independent learning disability evaluation of E.J. which the Board had refused to provide; and (4) provide a supplemental occupational therapy evaluation. E.J. IV at 54. The ALJ McGill's final paragraph is instructive:

> This decision would not be complete without a comment on Mansfield's seemingly endless attacks on the parent, W.B. Evidently, Mansfield believes not only that W.B. is overly persistent, but also that she is

---

[4] Shortly after the E.J. I settlement, W.B. requested a few modifications to the IEP and then that E.J. be placed in a private school because the Board was unable to provide the free appropriate education to which E.J. was entitled. The Board refused, two petitions followed, and they were consolidated before ALJ McGill. At the hearing, W.B. withdrew her request for private placement. The Board asked that the withdrawal be with prejudice or conditions, but ALJ McGill granted it without prejudice. E.J. v. Mansfield Board of Education, OAL Dkt. Nos. EDS 6199-93/6302-93, August 6, 1993 ("E.J. II") at 9. In August 1993, the ALJ found further that there had been no change of circumstances since implementation of the IEP and dismissed W.B.'s petition to modify it. Id. at 5, 8.

Before the decision in E.J. II was rendered, W.B. filed another petition alleging changed circumstances that necessitated E.J.'s placement in a private school. This petition was referred to ALJ McGill, and on September 1, 1993 he denied it, reasoning that no changed circumstances warranted amending the IEP. E.J. v. Mansfield Board of Education, OAL Dkt. No. EDS 7538-93 (September 1, 1993) ("E.J. III"). W.B. appealed E.J. III to the district court in an action which was consolidated with the instant damages action. W.B. and the Board eventually entered into a stipulation of dismissal regarding the E.J. III claims. See note 8, infra.

9

trying to wear down the district to obtain services to which E.J. is not entitled. In my view, however, W.B. was essentially correct about the major points in dispute in these proceedings including evaluation, classification and placement. Nonetheless, the district has consistently denied W.B.'s reasonable, appropriate, and meritorious requests related to E.J.'s education. The basic dynamic of this entire dispute is that the district has denied W.B.'s meritorious requests and W.B. has been left with no alternative to an enormously burdensome struggle in order to obtain E.J.'s rights under IDEA. In my view, the burden placed on W.B. was unnecessary, unwarranted and largely the product of the district's unwillingness to recognize and appreciate E.J.'s neurological impairments despite ample reliable evidence thereof.

E.J. IV at 54. According to plaintiffs, Mansfield has appealed E.J. IV to the district court.

The instant action

W.B. commenced this proceeding in July 1993, several months after the Board settled E.J. I by classifying E.J. as neurologically impaired and approving an IEP. The complaint alleged causes of action directly under § 504; causes pursuant to 42 U.S.C. § 1983 for violations of procedural due process, the equal protection clause, and rights secured by IDEA, its regulations, § 504, and state statutes; causes pursuant to 42 U.S.C. § 1985; and causes directly under the New Jersey Constitution and statutes. W.B. sought compensatory and punitive damages for defendants' failure to provide E.J. a free, appropriate public education.

The district court consolidated the action with W.B.'s appeal of E.J. III. After the parties consented or stipulated to the dismissal of a number of defendants, those remaining in the case were Matula, the principal; Engelhardt, E.J.'s first grade

10

teacher; Beach, his second grade teacher; Brennan, director of the CST; Burns, the school administrator; and Noctor, the school nurse, as well as Dr. Gary Danielson, the school psychologist and a member of the CST; Patricia Cericola, a speech and language therapist and member of the CST; and Ann Pearce, a learn_!ÁÁhh#ÁÁÀ(ÁÁ–ÁÁpp2ÁÃÃÄÄÐÐÁÁÁ``ÁÁ¸¸ÁÁÁÁhh#ÁÁÀ(ÁÁ–ÁÁpp2Á